Good afternoon, members of the Court and Counsel. My name is Lawrence Schimansky. I represent Nesko Electric Company. I am deaf in my right ear and hard of hearing in my left. I've appeared before you before. I tend to be loud and it helps if I have eye contact if you ask me a question so I can zero in on you. Did you get a copy of the motion signed by the Additional Authority? Yes, I did, Your Honor. Any objection to it? No, Your Honor. Please proceed. On April 23, 2002, Leo McDevitt had a work-related injury. He injured his back. It was a compensable claim. He had the surgery. He recovered from that surgery and he returned to work. He was back to work for four months and took another period of lost time because he had an increased pain problem. And he went through a series of evaluations, including one by a medical expert retained by the employer, Nesko Electric, and he was released to return to work based upon that evaluation consistent with the Act and the rules governing practice before the Industrial Commission. We notified Mr. McDevitt that his ongoing period of TTD at that time would terminate on November 5, 2003. On November 6, 2003, Leo McDevitt died. From the facts presented to the arbitrator and commission, the ruling was that it was a suicide, committed suicide, and various medical experts were called. A series of issues here. Number one, let's make sure we understand what we're looking at. He filed an application for the first accident, properly filed. He was a petitioner and it named an accident date of April 23, 2002, the day he hurt his back. After his death, a second application was filed. This was filed by Siri McDevitt. It named an April 23, 2002 accident date because the theory they were running under was that the suicide was causally connected to the original back claim. The commission, on their own motion, so spontaneous, they changed the accident date and created a new cause of action for Siri McDevitt. What they did was they changed it to the date of death, November 6, 2003. They did so after the statute of limitations had run, and they created this new cause of action because, as I pointed out in the case law, and as Ashley mentioned in the motion that was filed under the new Barbie case, the applicable statute is based upon the date of death. That's the applicable statute. But that isn't the theory they prosecuted this case on. They never did. They chose, because they never put in evidence that established the different wage rates available to the decedent's widow. They didn't establish any of the facts for that date of death. They established it all under the original application, and why did they do that? It's a very fundamental reason. They did not want the arbitrator, the commission, the circuit court, or this court to answer this question, and that is, when an employer wrongfully terminates TTD, are they responsible for the psychological effects on the claimant for that termination? He received that letter. He was advised that his TTD was terminated. He suffered from psychological problems, none of which were glaring from any of the medical records, because if you read the treating medical records and all the things leading up to it, although there was mention of psychotropic drugs that he was taking, none of us were sensitive to that. We didn't know he committed suicide. Nobody would lay back and let him do it. It was an unforeseen event which, according to the testimony, was caused by a condition from which he suffered psychologically. It's called catastrophizing. Are you saying there was no indication to the employer any time that the claimant was traumatized by the termination of TTD? Was there something in the record where the person who informed him of that said he started acting very strangely? No. The testimony was he started acting strangely after the receipt of the letter. We were never aware of that. His widow was aware of it. His mental condition deteriorated dramatically following the receipt of the October 27 letter terminating benefits. In addition, his friend, who he went to AA meetings with, testified, and his name was Houlihan, I believe. He testified there was a dramatic change in his psychological condition. So all those things were triggered by the letter. You can't answer that question in the affirmative. The termination of TTD benefits is lawful under the facts of this case. He was evaluated, an IME was conducted, a review of the MRI study was conducted, and the doctor said he was capable of returning to work. What we did is what we're required to do under the statute and the rules. We asked the option through counsel to file a 19B petition or any other action he wishes to bring to reinstate benefits and begin going that way. It never got there. The TTD benefits were terminated, effective November 5th, and in the early morning hours of November 6th he was dead. The commission's actions did three things. Number one, when the commission amended the statute, the statute of limitations had run, and there are effects on an employer when the statute of limitations has run on something, and you create a new cause of action. You have a new accident date now. It's November 6th, 2003, not the original April 23. You have insurance coverage questions and everything else. The commission did this to a spot. They didn't have a hearing. They didn't give us a chance to put in evidence. One of the arguments made by counsel is you didn't present any evidence. We didn't know how we were going to do it. We told them not to. Well, at what point in the proceedings did they make that amendment? They made an amendment in the commission decision that issued... So this is after a full hearing, right? I'm sorry? This is after a full hearing. Oh, again, the arbitration hearing had been conducted, completely conducted. The arbitrator had ruled, you know, we went on briefs, we went up on review, we had an oral argument, and then they ultimately issued a decision. So what happens if a claimant merely pleads an incorrect date? Well, would the commission not then find, make a factual finding as to the correct date? No, correct it. When an accident date is an issue, the commission routinely finds accident. We have repetitive trauma cases that you've seen how many times up here, hundreds of times, no doubt, where the accident date is the issue. That wasn't the case here. It was never the issue. In order to prove their case, they had to say there was a gradual deterioration of his mental condition from April 23, 2002 to the date of his suicide. They had to connect it up. Because if the question becomes one of is the letter the trigger? It's not compensable. Although there's no case law directly at point, how could it be compensable? Every employer who sends a letter out saying you're terminated is now subject to the whims of psychological conditions for which claimants suffer. He catastrophized, he saw the worst of it. We brought in an accountant to show it wasn't as bad as he thought and all of that. But the point is his psychological condition triggered his suicide, not his back pain. What about the combination thereof? Is it not compensable? Is a combination of the pain as well as the termination of the TTA? Well, that really becomes the question, doesn't it? Because if it's a combination of what occurred, the argument could be made that it is compensable, but is it? This goes to the Manifest Weight question about is the suicide actually causally connected to the April 23, 2002 accident? Is there really an unbroken chain? Dr. Aholsky says, oh yes, that's their hired expert. There is. There is no other evidence in this record to support it. The widow testified he was happier than he had been in years. They had just been on vacation. In September, things were going really well. Believe it or not, when he went for the treatment, following his recurrent CTD period, he had been back to work for four months. He's now on recurrent CTD because he had complaints of pain and he goes back to a doctor. They send him to a pain management clinic that works him up. They work him up, they ask him suicidal ideation, he fills out all the questionnaires. There is no psychological aspect of this claim that shows a deterioration of his condition. No additional medical treatment. No psychological treatment. No additional prescription medication. No increase in prescription medication. No additional visits to a social worker or to a psychologist. And those records show a maintenance of his condition that's allowed throughout. The only one that says that's not true is Aholsky, but he can't point to a thing in the record. Hang on, is that really true? Who is Dr. Ganellan? Ganellan is my expert. That's the expert I retain to review those records. Didn't he agree and testify Leo's mental state worsened in the weeks prior to his death? Yes. Worsened after receiving a letter terminating his TTD benefits. He said that receiving a letter terminating TTD benefits may have been a factor in his behavior. Yes, Dr. Ganellan said that. Doesn't that support Aholsky? How does that contradict Aholsky? Well, both of them are pointing to the change in his condition following the receipt of the letter. The letter is the triggering factor. There's no question Aholsky says the same thing. That was the triggering factor. That's the reason he broke the camel's back. Dr. Ganellan says the same thing. He was fine until he got the letter. His condition deteriorated and he fell off the face of the earth, so to speak. Aholsky clearly testified that it was a combination of these other factors. The termination of TTD broke the camel's back, but he also talked about chronic pain disorder. Did he not? That's correct. Dr. Aholsky says that the medical records support the conclusion that his psychological condition gradually deteriorated. He also says that the interviews with Julianne and the widow support that conclusion. It's not in the records. The widow said he was psychologically better than he had ever been. Holyhand said the deterioration didn't occur until after the receipt of the letter. The pain management clinic records show that he had a stabilized condition and they offered no additional treatment for a psychological condition. The social workers records show that he was on medication and had been for many, many years, I think 14 years total, and there was no change in his condition. He did not go back for additional treatment or anything else during that period. He didn't ask for an increase. The only one who says it worsened is Aholsky. There's nothing else there. Who's Conowitz? Conowitz is the pain management clinic physician. Conowitz is the person they sent him to, Dr. Butler sent him to Conowitz when he could find nothing explaining his increased subjective complaints of back pain. Conowitz is the doctor with his associates who gave him the medical treatment, did the questionnaire for suicidal ideation, and did everything else. And Conowitz did not increase or melt any change in his psychological condition. What the commission did was they sidestepped the statute that when you have one accident, one accident, April 23, 2002, you cannot award all permanent partial disability and death benefits. You are stuck with one or the other. It's mutually exclusive. The way they sidestepped that statute was to amend the application to provide a new cause of action and a new accident date. The arbitrator's decision on its face was contrary to the law because she awarded both under the same accident date. The commission, to sidestep that issue, amended the application contrary to their own rules and the case law supporting that those amendments must be done prior to a substantive hearing on the case. This was a consolidated case, wasn't it? Yes, and we're consolidated here, Your Honor. We're not consolidated below. What does it mean when they said in their opinion that we've got one decision in 02WC28168 and they also have a stamp on here, 07IWC0420. We've got one decision here where there is no amendment to the judgment. We have one decision here where there is no amendment to the judgment date. That was a unanimous decision. We have another decision where there was an amendment to the judgment date and it's 03WC59039. There's two separate decisions of the commission, one in which they amended the judgment date and the other in which they didn't. Let me see if I can describe the procedural history very quickly. One of them is an action in favor of the decedent himself. Yes. Prosecuted by his wife. What's your complaint with what occurred in that case? The action, that's the first action, that's the claim for permanent partial disability, 30 of a man award, plus the medical TTD that had been paid to date on that case. The argument with that is that that is a speculative award because his medical condition had not plateaued, he was not at maximum medical improvement. There was no evidence to determine the true nature and extent of that They never changed the date of injury in that case, did they? No, they did not. They changed the date of injury in the case that was brought by Sherry McDevitt as a widow, her own action, her own individual action, as a result of the death. What date did he die? He died on November 6, 2003. They amended the application for Sherry McDevitt's claim in the second case to April, from April 23, 2002, the original accident date when he heard his back. Of course, that wasn't the date of her claim, was it? No. The date of her claim was date of death, November 6 and November 7, 2003. You knew that all along, didn't you? Oh, yes, on the top of the application, there's November 6, 2003, date of death. No secrecy, you weren't prejudiced by that amendment, were you? How were you prejudiced? I can tell you exactly how we were prejudiced. How were you prejudiced? When you have a November 6, 2003 accident date, you have a different insurance carrier for this employer. This employer did not notify that carrier of the accident date because the date was not the same accident. You represent the employer, not the insurance company, don't you? That's correct, but it's financial. So if the insurance company wants to come in here and argue that it would be to their detriment, that's something else. Or if they want to come in and argue that she's not covered. But as far as the employer is concerned, the employer was not prejudiced at all, was he? The employer is prejudiced by the financial commitment that it loses from an insurance carrier for an accident date of November 6, 2003. But the employer always knew the day he died, didn't he? Yes, they knew the day he died. Okay, so they know who their insurance carrier was on the day he died, don't they? I'm sure they did. So if they don't report it, that's their problem, isn't it? Counsel, can you hear me? I'm sorry, Your Honor. Your time is up. You'll have time over both. Yes, Your Honor. Counsel, please. I apologize, Judge. I didn't hear you. May it please the Court. Good afternoon, Your Honor. Jack Cannon on behalf of Siri McDevitt. Just to pick up on Your Honor's last point, I'm looking at the two applications that were filed in this case. Most of the information on here is the same. We've got the same respondent, got the same social security number for the decedent. And as Your Honor pointed out, on the second application, which the respondent is focusing on, and they start talking about theories that we were allegedly proceeding under, it clearly says on the top of this, the date of death is 11-6-03. And I read the transcripts. I didn't try this case, but I read the transcripts, and I read the decision. They defended on the death because they knew the substance of the claim. Now, if you do come halfway down the form. Let me ask you first. Counsel, would you want to move your chair so you can hear better? I can hear him fine. Jack is loud enough. Mr. Kahn is loud enough. We don't know each other. Thank you. Thank you, Mr. Shmansky. We'll take official notice if Jack is loud enough. Okay. Thank you. I've never been accused of not being loud enough, funny enough. Halfway down the page, it says April 23, 2002. Yes, it does, and that's what they want to focus on. But if you look at the application right at the top, it says date of death. And the petitioner is the widow. So they know exactly what it is, and because they knew exactly what it was, they defended the case vigorously. And they went out and they hired Dr. Gnallan. But then what does Dr. Gnallan say? He says the letter is a triggering event. So then Respondent comes in and says, comes up with some reason as to why somehow we would monkey with dates or something like that because it doesn't match up with the theory that we were proceeding under. The theory we're proceeding under is quite clear, was that the letter and the psychological condition of the petitioner resulted in the suicide was a triggering event, and that's what both of the doctors said. What psychological condition? The psychological condition of catastrophicizing, which is what both of the doctors agree on. And as Gerardo pointed out, and I think it's very critical to what we're talking about here, looking at Dr. Conowitz's notes from August of 2003, Dr. Conowitz's notes says that Mr. McDevitt complained that he was so sad or unhappy that I can't stand it, and that he cried more now than I used to. And so clearly this man is going downhill. His physical condition is deteriorating. He then gets seen by Dr. Levin. Don't you have to establish that there's a causal connection between the actual accident and the injury suffered from that accident and the suicide, not a causal connection between him getting some letter telling him that they're going to stop his TTD and suicide. I agree with you, but I think that the error that Respondent is making is somehow suggesting that everything hinged on the letter. No, he was going downhill from there. He's in pain management. He's got complaints of having psychological problems going on. Dr. Levin examines him. Dr. Levin, interestingly enough, says he's at MMI, yet Respondent says that how are they proven up to permanency, and that's a separate dispute. But Dr. Levin agreed that the man had continued pain in his back and his left leg and numbness and L5 radiculopathy, but yet still said that he could go on and work full duty. So then the letter comes to the petitioner saying your benefits are going to be cut off, you can work full duty, and that next day after his benefits are being terminated, because his benefits were going to run out November 5, 2003, he commits suicide November 6, 2003. Let me just interject. He seems to be arguing, what did the employer do wrong? I'm not saying that. This is not a false system. All right, so basically you're saying that foreseeability is not an issue in a worker's employment. No, it's not. They have every right to send that letter if they so choose. That's understandable. But it's just like they have every right to run a business, and sometimes your employees get worked. And not every situation is foreseeable. This is not a civil action. This is not a third-party action. It's not a question of foreseeability. And then just to get back to what I lost my train of thought there a little bit, but we've got Conowith saying that the man is at MMI. There's got to be something more than the letter. If the only thing that triggered his suicide was the sending of the letter, you have no claim for death. If a cause of his suicide was some psychological injury that he suffered as a consequence of the accident, then you've got an action for the suicide. So what's the evidence in the record that establishes that his work-related accident was a cause of some psychological condition that caused him to commit suicide? He suffers the work-related injury. He undergoes the surgeries. He's got ongoing and continuing complaints of pain. Well, just tell me what experts said it was. What experts said it? Dr. Abolsky pointed to Conowith's records and said, look, he's relating his depression to his ongoing pain and his inability to work. That's in the records. And then Dr. Ganellan says, this man is going, their own expert that they hired, this man's going downhill, and then he has the triggering event, and the day after his benefits are cut off, he commits suicide. There seemed to be some suggestion that there should have been or could have been a 19B file, and I don't think that's exactly what counsel meant, because the man committed suicide the day after his benefits were cut off. That would put him on some sort of rocket docket for a 19B. You can't file it until your benefits are terminated. As to causal connection, it's a manifest way to argument. There's abundant testimony here regarding the causal connection. In fact, I think even Dr. Ganellan gives it. In terms of the PPD, the inspector, the respondent's own section 12 examiner said that this man was at MMI. 30% of a man as a whole for a laminectomy or discectomy for amyotomy with continuing radiculopathy at the L5 level is not unreasonable. There's abundant case law to say that the death claim is separate and distinct from the permanency claim. And based on all of that, I would ask that this panel affirm the decision of the commission. Even the dissent from Commissioner Lindsay did not focus anything on this amendment date or anything like that. She focused on the causal connection, which is what respondent focused on in their defense. But now they want to change what their focus is here. We would ask once again that the court affirm the decision of the commission. Thank you. Thank you, Counsel. Rebuttal, please. Yes, Your Honor. The triggering of that was the letter. And his psychological condition was the catastrophizing that led to his suicide. Dr. Abolsky said it. Dr. Ganellan said he believed it could be true but wasn't certain on that. But Dr. Abolsky said, and if I could paraphrase this quote, it is the straw that broke the camel's back. It's on page 551 of the record. That is the triggering event. And counsel says that letter makes it a compensable accident. It does not. That does not make it a compensable claim. No, he doesn't say that the letter made it a compensable claim. That's not what he said at all. What he said was the effects of the accident that led to his psychological condition, which Abolsky said, I think of pain, was a cause of the suicide. It doesn't have to be any cause. He never said that the letter was the cause. But what the expert said was the catastrophizing was the triggering event, and it is that psychological condition that causes the suicide. But that's not what Abolsky said. And we didn't cause the catastrophizing. We just had a reaction from him for sending the letter. We didn't make the catastrophizing work. What about the chronic pain disorder? Are you saying there was no connection between the injury and the chronic pain disorder? The chronic pain disorder and his psychological condition, if we look at those in parallel, there's no question he was suffering from pain. Even my own expert, Dr. Levin, who, by the way, although he tried to cut his legs out, he's the one who recommended the first surgery. So Levin comes in to see if he needs to go back to work. He acknowledges he's still experiencing pain. People who have back fusion surgeries have residual pain. They also have radicular symptoms because of damage to the nerve. It doesn't prevent them from returning to full-duty work unless the condition is so significant that they can't perform their usual customary job duties. Dr. Levin conducted his own independent medical evaluation to see if the condition had worsened to that level. He did an examination first, and he needed to see the most recent MRI. So we didn't even cut him off then. We cut him off only after the MRI came back. He examined the MRI, said there was no new herniated disc or no new impingement on the nerves, and therefore, I conclude, he can return to full-duty gainful employment. Dr. Levin then issues that subsequent report, and that is when we triggered the letter for the termination of benefits. The catastrophizing is that- Yes, sir. Obolsky opined that this man suffered from a chronic depressive disorder, coping traits affecting a medical condition, and a chronic pain disorder caused by his work injury of April the 23rd, 2002. Then he opined further that his death was caused by a combination of factors, including his chronic depressive disorder, coping traits affecting a medical condition, chronic pain disorder, and acute stress of being removed from workers' compensation coverage. How can you argue that Obolsky did not opine that a cause of this man's suicide was his accident of April? I don't make an argument. The argument I make is, and it's analogous to something to this effect, if I bring in an art student and they tell you, because I studied art, that sky is oxblood blue or oxblood red, and what you think you see is irrelevant. That's what Obolsky did. He picked and chose isolated single sentences. He took a condition that had been around for 20 years and said that condition was worsened, and there is not one iota of medical evidence contained in all of the treatment he had that supports that condition, that it worsened as a result of this accident. He had no ongoing treatment, no increase in prescriptions. It was a chronic pain disorder. A chronic pain disorder is something he suffered from and could be diagnosed with this individual. He had residual pain from the spinal fusion surgery. There's no question about that. Well, he says the chronic pain disorder contributed to his suicide. That's not what killed him. What killed him was his pedastrophizing. It was the electric fish. Says who? Thank you, counsel. Your time is up. The court will take the matter under advisory for discussion.